IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

KARSTEN O. ALLEN,  )
 )
 Plaintiff, ) Case No. 7:21-cv-00207
 )
v. ) **MEMORANDUM OPINION**
 )
LARRY FIELDS, *et al.*, ) By: Hon. Thomas T. Cullen
 ) United States District Judge
 Defendants. )

---

Plaintiff Karsten O. Allen ("Allen"), a Virginia inmate proceeding *pro se* and *in forma pauperis*, filed this civil rights action under 42 U.S.C. § 1983 alleging six different claims—including excessive force, retaliation, due process violations, and denial of adequate medical care—against seven Virginia Department of Correction ("VDOC") and Keen Mountain Correctional Center ("KMCC") staff.[1] By Memorandum Opinion and Order entered September 27, 2022, the court granted a partial motion to dismiss most of the defendants and claims from this suit. (*See* ECF Nos. 34, 35.) Following that ruling, Allen's two remaining claims are for excessive force and First Amendment retaliation against the sole remaining Defendant, Unit Manager Larry Fields. This matter is now before the court on Fields's motion for summary judgment.[2] (ECF No. 37.) The motion has been fully briefed and is ripe for decision. Having reviewed the record and briefs, the court will deny Fields's motion.

---

[1] The original seven Defendants were: (1) KMCC Unit Manager Larry Fields ("Fields"); (2) KMCC Institutional Hearings Officer T. Lowe; (3) KMCC Unit Manager A.T. Collins; (4) former KMCC Warden Clint Davis; (5) VDOC Regional Administrator Carl Manis; (6) VDOC Offender Discipline Manager Karen Stapleton; and (7) KMCC Nurse Rachel Harmon. (Compl. ¶¶ 4–10 [ECF No. 1].)

[2] Allen has also filed what the court construes as a supplement to his opposition brief. (ECF No. 45.) This supplement primarily outlines Allen's concern that the court might not consider his affidavit because it was not

# I.   BACKGROUND

The following facts are either undisputed or presented in the light most favorable to Allen. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## A.  Allen's Transfer to KMCC and Initial Complaints

On February 21, 2020, Allen was transferred from Sussex I State Prison ("Sussex I") to KMCC, where he was incarcerated during all times relevant to this lawsuit. (Compl. ¶¶ 3, 11; Viars Aff. ¶ 4, Nov. 18, 2022 [ECF No. 38-1].) Immediately after being transferred to KMCC, Allen claims that he asked a counselor about conducting an interim classification review[3] because one of his disciplinary convictions had been overturned. (*Id.* ¶ 11.) The counselor allegedly told Allen that he needed to seek approval from his Unit Manager—Defendant Larry Fields.[4] (*Id.*; Larry Fields Aff. ¶ 4, Nov. 17, 2022 [ECF No. 38-2].) When Allen subsequently spoke to Fields about the interim review, Fields allegedly told him that he would "look into it." (*Id.* ¶ 12.)

Sometime later, Allen apparently followed up with Fields regarding the status of his request, and Fields allegedly stated, "Just because [the disciplinary conviction] was overturned doesn't mean your [*sic*] innocent." (*Id.* ¶ 13.) Allen further alleges that Fields told him that "he would not allow anyone coming from [Sussex I] to be transferred without having first stayed at KMCC for one year charge-free." (*Id.* ¶ 15.) When Allen protested this statement on the

---

properly verified. But the court will consider Allen's affidavit as verified for purposes of analyzing Fields's motion for summary judgment. Accordingly, to the extent that Allen requests the court to consider his affidavit as part of the record, his motion to supplement (ECF No. 45) is granted.

[3] This review, Allen contends, would adjust his good time earning level and make him eligible for transfer to a lower-level security facility. (Compl. ¶ 11.)

[4] At all relevant times, Fields was the unit manager for Building B, where Allen was housed. (Fields Aff. ¶ 4.)

basis that, "per policy, he wasn't required to stay one year since he'd come to KMCC on administrative transfer rather than security transfer," Fields responded, "I don't care about [VDOC] policy. That's my policy." (*Id.*) Meanwhile, Allen filed a series of grievances regarding the living conditions of his pod and his medical treatment, which Fields allegedly reviewed.[5] (*Id.* ¶ 16.) As a result, tensions allegedly continued to rise between Fields and Allen. (*Id.*)

During this time, Allen also alleges that he was experiencing pain in his right shoulder from a "medical condition causing chronic pain."[6] (*Id.* ¶ 17.) When Allen notified officials of his "condition," officers began "constantly responding to [Allen's] emergency grievances and

---

[5] The court is only aware of one informal complaint (related to pain in Allen's arm and hand) that Fields responded to. (*See* Informal Complaint, Mar. 25, 2020 [ECF No. 42-3].) But the court is aware of numerous other complaints, grievances, and lawsuits filed against other VDOC staff, though not necessarily reviewed by Fields. But as a practical matter, as Allen's unit manager, Fields was likely aware of some of these complaints.

[6] Allen has an extensive medical history relating to his right hand, arm, and shoulder. From his initial transfer to KMCC through May 1, 2020, he was seen by medical providers (nurses, nurse practitioners, doctors, etc.) or complained of pain nearly a dozen times. On March 15, 2020, Allen submitted a sick-call request for back and shoulder pain and was seen by the Nurse Practitioner ("NP") three days later. (A.E. Whited Aff. ¶¶ 5–6, Nov. 18, 2022 [ECF No. 38-4].)  When he was seen by the NP, Allen reported a history of dextroscoliosis and pain in his right shoulder stemming from exercise. (*Id.* ¶ 6; Compl. and Treatment Form [ECF No. 38-4 at 75].) On March 25, 2020, the NP saw Allen for arm pain. Allen's range of motion was intact, but the NP recommended him for an x-ray. (*Id.* ¶ 7; Compl. and Treatment Form [ECF No. 38-4 at 75].) On April 6, 2020, Allen requested to see the doctor for right-shoulder pain, which he contended was out of place for two weeks. (*Id.* ¶ 8; Health Serv. Compl. and Treatment Form [ECF No. 38-4 at 74].) Although the nurse noted that Allen had full range of motion, she placed him on the list to see the doctor. (*Id.*) On April 8, 2020, Allen was brought to see the NP for shoulder pain; he complained of right-hand pain, weakness, numbness, and tingling, which he alleged had been present for three weeks. (*Id.* ¶ 9.) The nurse ordered an x-ray and insisted that Allen be issued a wrist brace. (*Id.*) Allen again requested to see the doctor for right shoulder and back pain on April 17, 2020, and he was placed on a list to see the doctor. (*Id.* ¶ 10.) On April 23, 2020, Allen was brought to medical for an appointment, but he refused to see the Physician's Assistant for evaluation. (*Id.* ¶ 11; Health Serv. Compl. and Treatment Form [ECF No. 38-4 at 73].) On April 28, 2020, Allen was seen by Medical after he complained of chest pain with sharp increases with movement. (*Id.* ¶ 12.) Although the NP did not note any distress, follow-up with medical was ordered. (*Id.*) Allen was also referred for an outside orthopedic consultation due to his persistent complaints about right-shoulder pain. (*Id.* ¶ 13.) On April 30, 2020, Allen was seen twice in the morning—once at 7:40 a.m., and again at 10:30 a.m.—where he complained of shoulder, back, and arm pain. (*Id.* ¶¶ 14–15; Health Serv. Compl. and Treatment Form [ECF No. 38-4 at 71–72].) The nurse ordered Allen to be monitored. (*Id.* ¶ 15.) On May 1, 2020, Allen was up at his cell door, was ambulating without difficulty, but complained that he could not move his right shoulder because he had been assaulted by a guard the day before. (*Id.* ¶ 16.)

requests for medical attention." (*Id.* ¶ 18.) Allen's consistent requests for medical attention, he contends, contributed to increased tensions between him, Fields, and other members of KMCC staff.[7] (*Id.*)

Over the ensuing weeks, Allen and Fields allegedly continued to argue about Allen's interim-review request, day-to-day issues in the housing unit, and his requests for medical attention, until tensions boiled over on April 30, 2020. (*Id.* ¶¶ 20–22.)

**B. April 30, 2020**

With respect to the events at 4:30 p.m. on April 30, 2020, the parties only agree to the broad contours of the interaction between Allen and Fields. They stipulate that Fields came to Allen's cell, B-410, and ordered him out into the vestibule where Lt. Harrison was waiting. (*Id.* ¶ 22; Fields Aff. ¶ 5; C. Harrison Aff. ¶ 4, Nov. 16, 2022 [ECF No. 38-3].) They also agree that once Allen exited his cell, Fields handcuffed him, took him to the third-floor vestibule where Lt. Harrison applied leg irons, and that Allen was then taken to segregation. (*Id.*; Fields Aff. ¶ 6; Harrison Aff. ¶ 4.)

With respect to the specifics of this interaction, however, Allen and Fields offer different accounts of why it happened; unsurprisingly, they also disagree on whether the force employed was excessive. According to Allen, he and Fields had an argument around lunchtime after he asked Fields about his interim classification review. (Compl. ¶ 22.) Allen contends that Fields yelled, "Stop asking me about that," and that Allen responded by threatening to file a

---

[7] For example, on one occasion when Allen was waiting for a medical appointment, Fields approached him and told Allen that he was not wearing an appropriate mask, which inmates were required to wear during the COVID-19 pandemic. (Compl. ¶ 20.) When Allen explained that he was waiting for a medical appointment, Fields allegedly stated, "Don't let me find out your [*sic*] lying." (*Id.*) Fields then stated that "all offenders lie," to which Allen "retorted, all white people lie." (*Id.*) Fields then became "visibly angry" and demanded that Allen retract his statement. (*Id.*)

lawsuit and complaints against Fields. (*Id.*; Karsten O. Allen Aff. ¶ 7, Jan. 18, 2023 [ECF No. 42-2].) Later that day, Allen claims that Fields came to his cell to retaliate against him for threatening legal action, even going so far as telling Allen that he was "going to jail." (*Id.*; Allen Aff. ¶ 7.) Consequently, Allen claims that Fields fabricated a disciplinary charge for destruction of property[8] because he never kicked his cell door, did not admit to doing so, and did not cause any paint to chip. (*Id.* ¶¶ 3–7.) Allen also claims that, when he was ordered into the vestibule, Fields "did not use proper training while placing handcuffs on [him], rather, he aggressively yanked the handcuff with [his] hand in it," which exacerbated his existing arm and shoulder injuries. (*Id.* ¶¶ 8, 10.)

On the other hand, Fields contends that he was working in his office on the third floor outside of Allen's pod when he heard a door being kicked. (Fields Aff. ¶ 5.) When Fields entered the pod where Allen was housed, he contends that he saw Allen's "door jarring as it was repeatedly kicked." (*Id.*) When Fields approached Allen's cell, he asserts that Allen admitted to kicking the door and stated that he was tired of being on the bottom tier and being shorted recreational time. (*Id.*) Fields claims that Allen's door-kicking chipped the paint on the cell door, so Fields filed the disciplinary charge against Allen for intentionally destroying

---

[8] Fields's Offense Report stated:

> On 4/30/2020, at 04:30[]p.m. in B-410 offender K. Allen did intentionally alter, damage, deface state property by repeatedly kicking the cell door removing paint and defacing the inside of the door. I heard the door being kicked from my office on the third floor and entered the B-4 pod. I could see the door jarring and made eye contact with offender Allen. Unusual behavior—Offender Allen admitted kicking the door and stated that he was tired of the bottom tier being shorted recreation time. Immediate action—Offender Allen placed in mechanical restraints and escorted to RHU without incident. Charged per OP 861.1.

(Fields Aff. Encl. A [ECF No. 38-2].)

property. Additionally, Fields claims that when Allen was subsequently ordered into the vestibule to be handcuffed, he used proper procedure and never yanked Allen's wrist while handcuffing him. (*Id.* ¶ 8.) Lt. Harrison added that he does not recall Allen making any complaints "about his arms being yanked or being injured in any way." (Harrison Aff. ¶ 5.)

## C.  Subsequent Disciplinary Hearing, Complaints, and Grievances

Following these events, Allen had a disciplinary hearing on his charge of destruction of property; he also filed several grievances and informal complaints about the incident. Allen's first set of complaints related to Fields's alleged use of excessive force. Allen accused Fields of using excessive force when he "put a cuff on [his] right wrist and yanked down knowing that [his] shoulder was injured" while transporting him to segregation on April 30. (Excessive Force Informal Compl., April 30, 2020 [ECF No. 38-1].) Lt. Harrison reviewed the informal complaint and determined it to be unfounded. (*Id.*) Allen then filed a regular grievance on May 20, 2020, reiterating his contentions contained in his informal complaint. (*See* Excessive Force Regular Grievance, May 20, 2020 [ECF No. 38-1].) When this grievance was determined to be unfounded (*see* Grievance Level I Resp., June 11, 2020 [ECF No. 38-1]), Allen appealed the decision to the regional administrator who, again, determined that Allen's grievance was unfounded. (Excessive Force Grievance Level II Resp., July 14, 2020 [ECF No. 38-1].)

Additionally, on May 20, 2020, Allen was convicted at his disciplinary hearing of destruction of property. (Compl. ¶ 27; Fields Aff. ¶ 7.) When Allen appealed his disciplinary conviction, it was upheld at all levels of review.[9] (*See* Fields Aff. ¶ 7; Disciplinary Appeal, May

---

[9] Appeals from a disciplinary conviction are governed by VDOC Operating Procedure ("OP") 861.1. OP 861.1 provides, "An offender has the right to appeal any finding of guilt . . . ." OP 861.1 XVIII(A). There are two levels of disciplinary appeals. Level I appeals are submitted to the Facility Unit Head unless the Unit Head is

31, 2020 [ECF No. 38-2]; Warden Davis' Level I Resp., June 3, 2020 [ECF No. 42-3]; Regional

Administrator Manis' Level II Response, July 9, 2020 [ECF No. 38-2].)

On May 25, 2020, Allen filed an informal complaint alleging that Fields "fabricated"

his disciplinary charge "in retaliation for [Allen] threatening to take legal action on an unrelated

matter." (Informal Compl., May 25, 2020 [ECF No. 38-1]; Viars Aff. ¶ 14.) Hearing Officer

T. Lowe responded to this complaint two days later and explained that Allen should raise any

other issues he had with his charge "in [his] appeal to the warden." (*Id.*) Although the court

thoroughly scrutinized the record, it does not appear that Allen did so.

Allen filed suit in this court on April 12, 2021, alleging six different claims—including

excessive force, retaliation, due process violations, and denial of adequate medical treatment—

against seven VDOC and KMCC staff. By Memorandum Opinion and Order entered

September 27, 2022, the court granted a partial motion to dismiss most of the defendants and

claims from this suit. (*See* ECF Nos. 34, 35.) As it stands, Allen's two remaining claims are for

First Amendment retaliation (Count I) and excessive force (Count III) against Fields. This

matter is now before the court on Fields's motion for summary judgment. (ECF No. 37.) The

matter has been fully briefed (*see* ECF Nos. 38, 42), making it ripe for decision. Having

reviewed the record and the parties' briefs, the court will deny Fields's motion.

---

the Reporting Officer. *Id.* at XVIII(E)(3)–(4). If the disciplinary conviction is upheld at Level I, the offender
may appeal the decision to the Regional Administrator for a Level II appeal. *See id.* at XVIII(F). Importantly,
"new appeal issues will NOT be considered at this level." *Id.* at XVIII(F)(3). This appeals process is separate
and apart from OP 866.1, which governs grievance appeals. That OP will be discussed more fully *infra*.

## II.   STANDARD OF REVIEW

Under Rule 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Glynn v. EDO Corp.*, 710 F.3d 209, 213 (4th Cir. 2013). When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . [any] affidavits" filed by the parties. *Celotex*, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law. *Anderson*, 477 U.S. at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* (cleaned up). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the moving party meets that burden, the nonmoving party must then come forward and establish the specific material facts in dispute to survive summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the nonmoving party. *Glynn*, 710 F.3d at 213 (citing *Bonds v. Leavitt*, 629 F.3d 369, 380 (4th Cir. 2011)). Indeed, "[i]t is an 'axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *McAirlaids, Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307, 310 (4th Cir. 2014) (cleaned up) (quoting *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (per curiam)). Moreover, "[c]redibility determinations, the weighing

- 8 -

of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not

those of a judge." *Anderson*, 477 U.S. at 255. The nonmoving party must, however, "set forth

specific facts that go beyond the 'mere existence of a scintilla of evidence.'" *Glynn*, 710 F.3d

at 213 (quoting *Anderson*, 477 U.S. at 252). The nonmoving party must show that "there is

sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."

*Anderson* at 249. "In other words, to grant summary judgment the [c]ourt must determine that

no reasonable jury could find for the nonmoving party on the evidence before it." *Perini Corp.

v. Perini Constr., Inc.*, 915 F.2d 121, 124 (4th Cir. 1990) (citing *Anderson* at 248). Even when facts

are not in dispute, the court cannot grant summary judgment unless there is "no genuine issue

as to the inferences to be drawn from" those facts. *World-Wide Rights Ltd. P'ship v. Combe, Inc.*,

955 F.2d 242, 244 (4th Cir. 1992).

### III.   ANALYSIS

Allen filed his complaint alleging violations under 42 U.S.C. § 1983. Section 1983

creates a private cause of action against anyone who,

> under color of any statute, ordinance, regulation, custom, or
> usage, of any State or Territory or the District of Columbia,
> subjects, or causes to be subjected, any citizen of the United
> States or other person within the jurisdiction thereof to the
> deprivation of any rights, privileges, or immunities secured by the
> Constitution and laws . . . .

42 U.S.C. § 1983. To state a cause of action under § 1983, Allen must allege facts that, if true,

would show that he has been deprived of rights guaranteed by the Constitution or laws of the

United States, and that the deprivation resulted from conduct committed by a person acting

under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988). Liability under § 1983 is

"personal, based upon each defendant's own constitutional violations." *Trulock v. Freeh*, 275

F.3d 391, 402 (4th Cir. 2001).

Allen asserts a § 1983 claim alleging violations of his First and Eighth Amendment rights. Allen alleges that Fields—who was indisputably acting under color of law—retaliated against him for threatening to take legal action against Fields, in violation of the First Amendment, and that he was victim of excessive force when Fields yanked his arm while handcuffing him, knowing that he had wrist, arm, and shoulder injuries, in violation of the Eighth Amendment.

## A. First Amendment Retaliation (Count I)

Fields argues that he is entitled to summary judgment on Allen's retaliation claim because Allen failed to exhaust his administrative remedies. (Def.'s Br. in Supp. Summ. J. p. 12 [ECF No. 38].) In so doing, Fields points to the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997(e), which requires an inmate to exhaust his available administrative remedies before commencing a § 1983 suit for a deprivation of his constitutional rights. After reviewing the record and applicable VDOC Operating Procedure, the court agrees that Allen appears to have failed to exhaust his administrative remedies, but on the current record, the court cannot conclude that those remedies were available to him.

### 1. Requirements for Exhaustion Under the PLRA

Under the PLRA, "[n]o action shall be brought with respect to prison conditions under section 1983 of [Title 42], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[E]xhaustion is mandatory under the PLRA and . . . unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007) (citing *Porter v. Nussle*, 534

U.S. 516, 524 (2002)). A prisoner must exhaust all available administrative remedies, whether they meet federal standards or are plain, speedy, or effective. *Davis v. Stanford*, 382 F. Supp. 2d 814, 818 (E.D. Va. 2005). Even if exhaustion would be futile because those remedies would not provide the relief the inmate seeks, it is nonetheless required. *Id.*

Ordinarily, an inmate must follow the required procedural steps to exhaust his administrative remedies. *Moore v. Bennette*, 517 F.3d 717, 725 & 729 (4th Cir. 2008); *see also Langford v. Couch*, 50 F. Supp. 2d 544, 548 (E.D. Va. 1999) ("[T]he second PLRA amendment made clear that exhaustion is now mandatory."). An inmate's failure to follow the required procedures of the prison's administrative remedy process, including time limits, or to exhaust "*all*" levels of administrative review is not "proper exhaustion" and will bar the claim. *Woodford v. Ngo*, 548 U.S. 81, 85, 90 (2006) (emphasis added).

In addition, the court is "obligated to ensure that any defects in administrative exhaustion were not procured from the action or inaction of prison officials." *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007); *see Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006). Accordingly, an inmate need only exhaust "available" remedies. 42 U.S.C. § 1997e(a). An administrative remedy is not available "if a prisoner, through no fault of his own, was prevented from availing himself of it." *Moore*, 517 F.3d at 725.

### 2. Exhaustion Analysis

In support of his exhaustion argument, Fields submitted the affidavit of KMCC's Grievance Coordinator H. Viars, which includes the VDOC's relevant Offender Grievance

Procedure—OP 866.1[10]—and Allen's grievance records. OP 866.1 details the grievance process by which offenders must resolve complaints, appeal administrative decisions, and challenge the substance of procedures. Viars explains that the grievance process provides corrections staff with a means to evaluate potential problem areas and, if necessary, correct those problems in a timely manner. (Viars Aff. ¶ 5.)

Allen's retaliation claim is plainly subject to the well-established requirements of this OP. (*See* Op. 866.1(IV)(M) (Grievable issues include: "Procedures of the facility, region, division, and department which affect the grievant personally, actions of individual employees . . . including the denial any denial of access to the grievance procedure, [and] reprisals[11] against the grievant for filing a grievance or grievance appeal.").) Accordingly, in making his grievance and exhausting his remedies, Allen was obligated to comply with OP 866.1.

Prior to submitting a regular grievance, an inmate must demonstrate that he has made a good-faith effort to resolve his complaint informally. According to OP 866.1(V), the first stage of the informal complaint procedure is for the inmate to communicate his concerns to staff verbally. If the issue is not resolved—or if the inmate is not satisfied with the resolution— he generally must document his good-faith effort using an informal complaint form[12] and

---

[10] When the events giving rise to Allen's claims took place, an older version of OP 866.1 was in effect. The amended version of OP 866.1 did not take effect until January 1, 2021, after the events giving rise to this lawsuit took place. As such, the court will look to the older version of OP 866.1 that was in effect during 2020 and which is attached to Viars' affidavit. (*See* OP 866.1 [ECF No. 38-1 at 9–22].)

[11] OP 866.1 defines a reprisal as "[a]ny action or threat of action against anyone for good faith use of or good faith participation in the grievance procedure." OP 866.1(III). In other words, a reprisal is an act of retaliation. (*See* Viars Aff. ¶ 5 ("Grievable issues include actions of staff and alleged retaliation.").)

[12] Informal Complaint forms are readily available to inmates in the housing units and/or other designated locations, as are Regular Grievance forms. (*See* OP 866.1(V)(A)(d) ("When requested, an Informal Complaint must be provided to the offender. Under no circumstances will staff deny offenders access to the Informal Complaint Procedure.").)

submit it to the designated staff member. (*See* OP 866.1(V).) When an inmate files an informal complaint, it is logged into VACORIS, the VDOC's computer-based offender information management system, and staff must print and issue a receipt to the inmate as written notification of its acceptance. (*Id.*)

If an inmate is not satisfied with the staff's response to his informal complaint, or if staff fail to respond to it within 15 days, he may file a regular grievance. (*Id.*; Viars Aff. ¶ 7.) In any event, regular grievances must be submitted within 30 days from the date of the incident complained of.[13] (*Id.* (VI); Viars Aff. ¶ 7.) After a regular grievance is accepted during the intake process,[14] there are up to three levels of review. Level I reviews are conducted by the Warden at the facility where the offender is located. (*Id.*; Viars Aff. ¶ 10.) If the offender is unsatisfied with the Level I determination, he may appeal that determination to Level II, which is conducted by the Regional Administrator. (*Id.*; Viars Aff. ¶ 10.) For most issues (as here), Level II is the final level of review. (Viars Aff. ¶ 10; *see* Excessive Force Grievance Level II Response, July 14, 2020 (". . . this is your last level of appeal. You have exhausted all administrative remedies.").)

---

[13] Regular grievances are considered received on the date it is stamped by KMCC's grievance department. (Viars Aff. ¶ 8.) If an inmate is unable to file the grievance within 30 days due to no fault of his own, he must submit the regular grievance within five days once the reason for the delay is no longer valid. (*Id.*)

[14] If a regular grievance does not meet the filing requirements of OP 866.1, it must be returned to the inmate within two working days from the date of receipt and include the reason for rejection on the second page of the regular grievance. (OP 866.1(VI)(B).) Reasons for rejecting a regular grievance during the intake process include, "more than one issue per grievance, expired filing period, repetitive, insufficient information, and requests for services." (Viars Aff. ¶ 9; *see* Regular Grievance, May 20, 2020.) If an inmate wishes to review an intake decision, he may indicate as much at the bottom of the grievance form and send the grievance to the Regional Ombudsman for determination. (*Id.*)

An inmate may file a lawsuit about an issue contained in his grievance only once he has exhausted all available steps in the Offender Grievance Procedure.[15] The exhaustion requirement is met only when a regular grievance is accepted into the grievance process and appealed without a result that is satisfactory to the inmate. (*Id.* ¶ 11.) Once the inmate has met his exhaustion requirement, the appeal respondent must notify the inmate that all requirements have been exhausted. (OP 866.1(VI)(C)(2)(g) ("[T]he offender should be advised that they has [*sic*] exhausted all administrative remedies.").)

In this case, Allen appears to have failed to exhaust his administrative remedies with respect to his retaliation claim.[16] As mentioned previously, Allen's claim that Fields retaliated against him is a grievable issue. (*See* OP 866.1(III); Viars Aff. ¶ 5 ("Grievable issues include actions of staff and alleged retaliation.")); *Edwards v. Lambert*, No. 7:20CV00095, 2021 WL 799302, at *3 (W.D. Va. Mar. 2, 2021) (finding that an inmate's allegation that staff filed a false disciplinary charge was grievable and that the inmate was required to exhaust his remedies through the grievance procedure). Because retaliatory acts of staff are grievable, Allen was required to informally raise this issue with staff, document this allegation in an informal complaint, file a regular grievance, and appeal that grievance through all applicable levels of review. (*Id.* (V)–(VI); Viars Aff. ¶¶ 7–11.) Although Allen filed an informal complaint asserting that Fields violated his First Amendment rights by fabricating a charge "in retaliation for [Allen's] threatening to take legal action on an unrelated matter," (Informal Compl., May 25,

---

[15] Inmates who are at substantial risk of imminent sexual abuse, serious personal injury, or irreparable harm may follow the Emergency Grievance Procedure for an expedited response.

[16] Fields does not contest that Allen fully exhausted his Eighth Amendment claim. In any event, the court notes that Allen has exhausted that claim. (*See* Excessive Force Grievance Level II Resp., July 14, 2020 ("[T]his is your last level of appeal. You have exhausted all administrative remedies.").)

2020), there is no evidence in the record that he took the necessary steps to exhaust his claim. Indeed, the record is devoid of a regular grievance or appeal regarding that claim.[17] Consequently, Allen did not exhaust his administrative remedies as to his retaliation claim.

Notwithstanding Allen's apparent failure to follow up on his informal complaint, the court is "obligated to ensure that any defects in administrative exhaustion were not procured from the action or inaction of prison officials." *Aquilar-Avellaveda*, 478 F.3d at 1225; *see Kaba*, 458 F.3d at 684. In so doing, the court notes that, in the light most favorable to Allen, Hearing Officer T. Lowe erroneously—according to OP 866.1—responded to Allen's informal complaint regarding his allegation that Fields fabricated a charge. In Allen's May 25, 2020 informal complaint, he alleges that:

> On 5-22-20 I received a receipt for a deduction of $15 for institutional fines resulting from a conviction in which *a charge was fabricated by Unit Manager [F]ields in retaliation for me threatening to take legal action on an unrelated matter. The retaliatory conduct violated by 1st Amendment right to petition the government for a redress of grievances.*

(Informal Compl., May 25, 2020 (emphasis added).) Despite this clear allegation that Fields fabricated the April 30, 2020 charge to retaliate against Allen,[18] Lowe responded, "You were found guilty of [a] III A offense on 5/20/20 with [a] penalty of [a] 15 Dollar Fine. Any other [i]ssues that you may have with your charge you may [a]ddress [i]n your [a]ppeal to [t]he Warden." (*Id.* (cleaned up).) Lowe seemingly directed Allen to address the substance of the fabricated charge in his *disciplinary appeal* to the warden, despite acts of retaliation being subject

---

[17] Allen avers that he "submitted an informal complaint concerning Fields filing a falsified disciplinary offense report" on June 15, 2020, that he "followed this complaint by a regular grievance" on June 21, 2020, and that he appealed the grievance to the regional ombudsman. (Allen Aff. ¶ 15.) But the court has not been provided with any of these documents.

[18] Allen's April 30, 2020 charge is what led to the disciplinary hearing in which he was fined $15.

to OP 866.1, rather than the disciplinary appeal process. (*See* Op. 866.1(IV)(M) (Grievable issues include: "Procedures of the facility, region, division, and department which affect the grievant personally, actions of individual employees . . . including the denial any denial of access to the grievance procedure, [and] *reprisals against the grievant* for filing a grievance or grievance appeal." (emphasis added)).) In the light most favorable to Allen, therefore, Lowe's response suggests that Allen's retaliation claim was not subject to the grievance procedure, which indeed it was. Consequently, insofar as Lowe's response to Allen's informal complaint misstated the appropriate procedure Allen was to follow, his response potentially deprived Allen of his administrative remedies with respect to his retaliation claim.

Accordingly, the court is not confident that it can fairly and appropriately rule on this claim before the evidentiary record is clarified. While Allen may have failed to exhaust his administrative remedies, he may have also been misled by Lowe with respect to what his appropriate remedy was, or how he was to pursue it. And if Allen was indeed misled, his administrative remedies may not have been available to him; indeed, Allen suggests as much in his opposition brief. (*See* Pl.'s Opp. Br. p. 5 [ECF No. 42-1] ("In practice VDOC officials across the board have interpreted . . . [OP 861.1—the wrong provision—] to apply to all disciplinary action including the submission of falsified charges.").) In sum, Allen may have been the victim of this apparent, inconsistent application of VDOC OP's *by VDOC officials*, which may have prevented him from availing himself of the applicable grievance procedure.

Finding a genuine dispute as to whether administrative remedies were available to Allen on this issue, the court will deny Fields's motion for summary judgment.

## B. Eighth Amendment Excessive Force (Count III)

Fields argues that he is entitled to summary judgment on Allen's excessive force claim because Allen was handcuffed for the purpose of restoring order and his allegations are not sufficiently serious to rise to the level of a constitutional violation. (Def.'s Br. in Supp. Summ. J. at 14–18.) In other words, Fields contends that Allen's claim fails under both the objective and subjective prongs of the required analysis. But the court disagrees because a reasonable jury could find that Fields used excessive force when he handcuffed Allen, knowing that he suffered from wrist, arm, and shoulder injuries, and that he acted in retaliation for Allen's complaints and threats of legal action.

### 1. Applicable Law for Excessive Force Claims

The Eighth Amendment protects prisoners from "cruel and unusual punishment" at the hands of prison officials. *Wilson v. Seiter*, 501 U.S. 294, 296–97 (1991). This includes punishments that "involve[] the unnecessary and wanton infliction of pain." *Gregg v. Georgia*, 428 U.S. 153, 173 (1976) (cleaned up). An Eighth Amendment excessive force claim "involves both an objective and a subjective component." *Dean v. Jones*, 984 F.3d 295, 302 (4th Cir. 2021); *Brooks v. Johnson*, 924 F.3d 104, 112 (4th Cir. 2019) (same). The objective component measures the nature of the force employed, asking whether that force was "sufficiently serious to establish a cause of action." *Brooks*, 924 F.3d at 112. This is not a high bar; "[s]o long as the force used is more than *de minimis*, the objective component is satisfied, regardless of the extent of the injury." *Dean*, 984 F.3d at 303; *Thompson v. Commonwealth of Virginia*, 878 F.3d 89, 98 (4th Cir. 2017) ("[A] prisoner who suffers a minor, but malicious, injury may be able to prevail on an excessive force claim . . . .").

The second prong of analysis, the subjective component, requires the court to determine "whether the officers acted with a sufficiently culpable state of mind." *Dean*, 984 F.3d at 302. "The state of mind required here is wantonness in the infliction of pain." *Id.* (cleaned up); *see Iko v. Shreve*, 535 F.3d 225, 239 (4th Cir. 2008). "Whether an inmate can establish that impermissible motive turns on 'whether force was applied in a good[-]faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'" *Id.* (quoting *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986)). The Fourth Circuit has explained that "officers employ force in 'good faith'—and thus permissibly—when they are motivated by an 'immediate risk to physical safety' or threat to prison order." *Id.* (quoting *Brooks*, 924 F.3d at 113). But when an officer inflicts pain not to protect safety or prison discipline, but to punish or retaliate against an inmate for his prior conduct, they cross the line into an impermissible and unconstitutional motive. *Brooks*, 924 F.3d at 113; *see Boone v. Stallings*, 583 F. App'x 174, 177 (4th Cir. 2014) ("[T]he Eighth Amendment does not permit a correctional officer to respond to a misbehaving inmate in kind."). "And the use of force on an inmate who is 'restrained and compliant and posing no physical threat' raises the specter of such an impermissible motive." *Dean*, 984 F.3d at 302 (quoting *Thompson*, 878 F.3d at 102).

"On summary judgment . . . the inquiry under the subjective component boils down to whether a reasonable jury could determine that an officer acted with malice, applying force punitively and 'for the very purpose of causing harm.'" *Id.* (quoting *Whitley*, 475 U.S. at 320–21). Because direct evidence of motive or intent is hard to come by, the Supreme Court has set out four factors—the so-called *Whitley* factors—from which a court "may infer the existence of the subjective state of mind required for an Eighth Amendment violation." *Brooks*,

924 F.3d at 116 (cleaned up) (quoting *Hope v. Pelzer*, 536 U.S. 730, 738 (2002)). Those factors are:

> (1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of any reasonably perceived threat that the application of force was intended to quell; and (4) any efforts made to temper the severity of a forceful response.

*Iko*, 535 F.3d at 239 (cleaned up) (quoting *Whitley*, 475 U.S. at 321). "If a reasonable jury could find, based on the inferences drawn under the *Whitley* factors or other evidence, that correctional officers used force maliciously to punish or retaliate against an inmate," then summary judgment should be denied. *Dean*, 984 F.3d at 302–03.

### 2. Analysis

In the light most favorable to Allen, there are genuine disputes of material facts that preclude the entry of summary judgment on his excessive force claim.

Beginning with the objective prong, the question for the court is whether a jury could believe that Fields's yanking of Allen's wrist constituted more than a *de minimis* use of force; in other words, that it was sufficiently serious. As a threshold matter, there are disputes as to whether Fields "yanked" Allen's wrist to begin with, to what extent he yanked it, and how much it exacerbated Allen's preexisting injuries. While Fields and Harrison contend that Fields followed procedure while handcuffing Allen, that Fields did not yank Allen's wrist, and that Allen never complained of pain (*see* Fields Aff. ¶ 8; Harrison Aff. ¶ 5), Allen contradicts those contentions. According to Allen, Fields did not follow procedure and instead, "aggressively yanked the handcuff with [his] hand in it," which caused him pain. Allen also filed an informal complaint *that evening* after he was taken to segregation, contending exactly as he does here—

that Fields used excessive force by yanking his wrist, knowing he had preexisting wrist, arm, and shoulder injuries. (*See* Excessive Force Informal Compl., April 30, 2020.) Allen was also seen by medical the very next day and complained that his injuries were exacerbated because he was "assaulted" by staff the previous day. (Whited Aff. ¶ 16.)

While a jury could certainly believe that Fields's yanking of Allen's wrist was *de minimis*, given the differing accounts of the interaction at issue, a jury could also believe that it was sufficiently serious, especially when considering Allen's documented medical history of arm, hand, and shoulder issues and Fields's alleged knowledge of those injuries. (*See generally* Allen's Med. Hist. [ECF No. 38-4 at 9–76]; *see also* Informal Compl., Mar. 25, 2020 [ECF No. 42-3].) In other words, a jury could find that Fields's yanking of Allen's wrist constituted a sufficiently serious application of force *for Allen*, even though the same force might be *de minimis* for someone without Allen's preexisting injuries.

Turning to the subjective prong, the court believes that a jury could also find that Fields acted with a sufficiently culpable state of mind when he allegedly "yanked" Allen's wrist. Specifically, a jury could believe that Fields filed a fabricated charge and ordered Allen out of his cell to retaliate against him, and then yanked Allen's handcuffs *knowing* that Allen had preexisting injuries, or applied such force when it was unnecessary. Viewed in tandem, these allegations could support an inference of malicious intent. *See Brooks*, 924 F.3d at 113 ("[W]hen an officer inflicts pain not to protect safety or prison discipline, but to punish or retaliate against an inmate for his prior conduct, they cross the line into an impermissible motive.").

As to the first point, Fields contends that he went to Allen's cell on April 30, 2020, because Allen had been kicking his cell door. Somehow, Fields apparently noticed that Allen's

door kicking had caused paint on his cell door to chip,[19] which caused Fields to charge Allen with destruction of property. (Fields Aff. ¶ 5.) But Allen denies that he did any such thing. Instead, Allen contends that he threatened Fields with legal action earlier in the day, and that Fields came to his cell to retaliate against him for doing so. According to Allen, therefore, Fields did not come to Allen's cell to "restore order," but to file a false charge against him and take him to segregation under false pretenses.

As to the second point, Fields knew, at least to some extent, that Allen had arm, hand, and possibly shoulder issues.[20] Indeed, on March 25, 2020, little more than one month before the April 30 incident, Allen filed an informal complaint relating to "numbness" in his arm and "visible swelling in his hand," to which Fields responded.[21] (Informal Compl., Mar. 25, 2020.) Therefore, if a jury believes Allen's story that Fields sought to retaliate against him, knew of his preexisting injuries, and nevertheless "aggressively yanked" his injured wrist while handcuffed, a jury could find that Fields used excessive force. *See Dean*, 984 F.3d at 302–03 ("If a reasonable jury could find . . . that correctional officers used force maliciously to punish or retaliate against an inmate," then summary judgment should be denied).

---

[19] Fields does not explain how he saw the chipped paint on the inside of Allen's cell door; when the cell doors open, they mechanically slide open, leaving the door nearly flush with the wall. (Fields Aff. ¶ 5; Compl. ¶ 27–28.) Allen contends that Fields never stepped foot inside of his cell, so it is unclear how Fields would have seen the chipped paint.

[20] Allen claims that Fields responded to medical complaints on "several different occasions," and that his wrist, arm, and shoulder injuries were "common knowledge" amongst security staff, including Fields, because they were usually responsible for the "initial encounters" before sending Allen to medical appointments. (Pl.'s Opp. Br. at 10.) As a practical matter, given Allen's extensive medical history relating to his wrist, arm, and shoulder—and Fields's status as his unit manager—there is a strong inference that Fields knew of Allen's injuries.

[21] Additionally, on April 8, 2020, a nurse also recommended that Allen be issued a wrist brace. (Whited Aff. ¶ 9.) But it is unclear whether Allen ever received this brace or if he was wearing it on April 30, 2020. Neither party addresses this issue, save for one line in Whited's affidavit.

Moreover, the *Whitley* factors can also be viewed to support an inference that Fields yanked Allen's handcuffs knowing that it was likely to cause injury to him, for no purpose other than to retaliate. Allen was compliant during the entire incident; there was no need to yank Allen's handcuffs or wrist for safety concerns, as he was merely being transported to segregation. It is likewise unclear whether Fields made any effort to handcuff Allen in a different way, knowing that Allen had preexisting injuries. And Fields may not have had any cause to remove Allen from his cell to begin with, if a jury believes that he fabricated the charge for destruction of property. In any event, much, if not all, of this record requires a factfinder to make credibility determinations between the conflicting versions of events offered by both parties and to draw inferences from the evidence in the record. *See Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions . . ."). And the court declines to usurp the role of the jury here.

Accordingly, Fields's motion for summary judgment will be denied with respect to Allen's excessive force claim.

## IV.   Conclusion

For these reasons, Fields's motion for summary judgment (ECF No. 37) will be denied. With respect to Allen's retaliation claim (Count I), Fields may request an evidentiary hearing on the issue of availability of administrative remedies within 14 days. If no request is made, Fields may, per his request in his motion for summary judgment, file another motion for summary judgment as to the merits of the retaliation claim within 30 days. If no such motion

is made, the matter will be set for a jury trial as to both Allen's retaliation and excessive force claims.

The clerk is directed to forward a copy of this Memorandum Opinion and accompanying Order to the parties.

**ENTERED** this 14th day of August, 2023.

*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT